PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO
—
© 2007 Thomson/West.

The summary, which does not constitute a part of the opinion of the court, is copyrighted

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RALPH KERMIT WINTERROWD, 2ND,
    *Plaintiff-Appellee,*

v.

BRAD L. NELSON; JOHN CYR; JORGE SANTIAGO,
    *Defendants-Appellants,*

v.

LEVITICUS WASHINGTON; MICHAEL E. BURKMIRE; DEL SMITH; DENNIS CASANOVAS,
    *Defendants.*

No. 04-35855

D.C. No.
CV-02-00097-JKS

OPINION

Appeal from the United States District Court
for the District of Alaska
James K. Singleton, Chief District Judge, Presiding

Argued and Submitted
July 25, 2006—Anchorage, Alaska

Filed March 30, 2007

Before: Alex Kozinski, Marsha S. Berzon and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Kozinski

3695

## SUMMARY

### Individual Rights/Civil Rights

The court of appeals affirmed a judgment of the district court. The court held that a verbal refusal to comply with a request during the course of an ordinary pat-down on grounds of physical impossibility does not justify the use of force.

Appellee Ralph Winterrowd brought an excessive force action in district court in Alaska under 42 U.S.C. § 1983, alleging that appellant state troopers used excessive force during a pat-down after he declined to comply with their order to put his hands behind his back because he had a shoulder injury. The troopers, who had pulled Winterrowd over for driving with suspected invalid license plates, responded by forcing Winterrowd onto the hood of the police car, grabbing his right arm and forcing it up, and, when Winterrowd screamed in pain, applying greater pressure. The district court found disputed material facts supporting Winterrowd's § 1983 claim. The court concluded that the troopers were not entitled to qualified immunity on summary judgment.

The troopers appealed, arguing that, because they removed at least 20 pens and pencils from Winterrowd's person, they could reasonably have concluded that he posed an immediate threat. The troopers also implied that their use of force was justified because Winterrowd carried a firearm in his car, although they did not know that when they used force on him. The troopers also cited Winterrowd's belligerent attitude and his belief that he was not required to register his vehicle, and claimed that they feared for their safety based on prior experiences with Winterrowd in which he used epithets against them.

[1] A statement that a suspect is physically unable to comply with a request does not, by itself, justify the use of force.

Instead, the police may use force only when the intrusion on the individual's liberty is outweighed by the governmental interests at stake. [2] Accepting Winterrowd's version of the facts, the troopers could not have so concluded on the basis of the immediate offense. No reasonable officer could conclude that an individual suspected of a license plate violation posed a threat that would justify slamming him against the hood of a car. [3] Nor could the troopers have so concluded on the basis of any other fact presented here.

[4] The fact that Winterrowd had more than the usual number of pens and pencils was of no consequence. Having a large number of pencils does not make it more likely that one of those utensils will be used as a weapon or otherwise enhance the risk to the officers. [5] Also, the troopers did not know that Winterrowd carried a firearm in his car when they forced him onto the hood of their car. In any event, Winterrowd was well away from his vehicle, and unable to access the weapon at the time. [6] Even if Winterrowd was adamant that registration was not required, that attitude would not justify the deliberate infliction of pain. At worst, the officers could conclude that he scoffed at state bureaucracy. Such an attitude poses no physical danger and thus cannot justify the force allegedly used here. [7] The troopers' generalized concerns for their safety based on prior experiences with Winterrowd, standing alone, could not justify the use of force. Assuming that Winterrowd had used epithets in the past, they would not justify the use of force. Police, may not exercise the power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment. [8] Even if the officers doubted Winterrowd's claim that he had a shoulder injury, they were not entitled to use force to gain his compliance. When no immediate threat is posed and the police can use other means of patting down a suspect, they may not insist on doing so in a manner that will cause the suspect pain. It had to be held that a verbal refusal to comply on grounds of physical impossibility does not jus-

tify the kind of manhandling that Winterrowd claims the officers inflicted on him.

[9] Officers are entitled to qualified immunity unless they have been given fair notice that their conduct was unreasonable in light of the specific context of the case. The Ninth Circuit has found it clearly established in 1998 that grabbing the arm of a suspect who passively resisted handcuffing, throwing her to the ground, and twisting her arms while handcuffing her was unreasonable. Because the law on this point was clearly established in 1998, it was also clearly established for the later incident in Winterrowd's case. No reasonable officer would believe he could constitutionally force a harmless motorist against the hood of a car and cause him unnecessary pain. That the suspect claims he is unable to comply with instructions to put his arm behind his back provides no further justification. No reasonable officer could have thought otherwise. [10] Because the facts, if resolved in Winterrowd's favor, would show the officers violated his clearly established constitutional rights, the district court did not err in denying the motion for summary judgment on grounds of qualified immunity. The judgment of the district court had to be affirmed.

## COUNSEL

Gregg D. Penkes, Attorney General, Stephanie Galbraith Moore, Assistant Attorney General, Anchorage, Alaska, for the defendants-appellants.

Ralph Kermit Winterrowd 2nd, pro se, Knik, Alaska, for the plaintiff-appellee.

## OPINION

KOZINSKI, Circuit Judge:

We consider a claim of qualified immunity for the use of force during an ordinary traffic stop.

### Facts

Ralph Kermit Winterrowd 2d wasn't weaving across the road when the Alaska State Troopers pulled him over. He wasn't speeding. He didn't even coast through a stop sign. He was pulled over because the troopers suspected his plates were invalid.

As is typical in such circumstances, the troopers who pulled him over—Brad L. Nelson, John R. Cyr, Jorge A. Santiago, and Robert M. Baty—asked Winterrowd to produce his driver's license and registration. Winterrowd was unable to produce valid registration.[1] The troopers then ordered him out of his vehicle. Because they intended to speak with him inside a patrol car, they attempted to perform a routine pat-down for officer safety.

As Winterrowd faced the police car, Nelson ordered him to put his hands behind his back.[2] Nelson saw no signs of a weapon, and Winterrowd offered no physical threat to the officers. Instead, Winterrowd explained that he could not put his hands behind his back because he had a shoulder injury. According to Winterrowd, the officers responded by forcing

---

[1] From what we can tell from the record, Winterrowd takes the curious (and legally unjustified) position that the State of Alaska lacks the authority to require him to register his vehicle.

[2] Nelson admits that he could have administered the pat-down in a way that did not require Winterrowd to put his hands behind his back. A pat-down can be conducted in a number of ways. The individual could hold his arms over his head, out to the sides or he could lean forward onto the police car.

him onto the hood of the car. Nelson then grabbed Winterrowd's right arm and forced it up. When Winterrowd screamed in pain, the trooper applied greater pressure, pumping his arm up and down. After several seconds of this treatment, Nelson released Winterrowd, who fell to the ground.[3]

Winterrowd brought this action in federal court. The district court dismissed most of his claims on summary judgment, but found disputed material facts supporting his 42 U.S.C. § 1983 claim that the troopers used excessive force during the pat-down.[4] The district judge concluded that defendants weren't entitled to qualified immunity on summary judgment. The troopers now bring this interlocutory appeal.[5]

## Analysis

A patrol officer may conduct scores of traffic stops every month, and perform numerous pat-downs. During the course of this work, the officer will inevitably meet individuals who cannot immediately comply with his instructions. People are slow or hard of hearing. They suffer from bad backs, joint problems or tendinitis.

Unlike the situation in *Thompson*, the officers here were not dealing with an unknown individual. See p. 3704 *infra*. Instead, at least one of those officers, Cyr, indicated that he was familiar with Winterrowd when they pulled him over; there is no evidence that Winterrowd failed to produce his driver's license. Whether the pat-down in this case was legal under *Thompson* is thus an open question. Because the legality of the pat-down is not at issue on this appeal, we assume—without deciding—that the pat-down was lawful.

[5]Winterrowd cross-appeals from the district court's grant of summary judgment to defendants on his other claims. We have jurisdiction to hear the government's appeal of his denial of qualified immunity because such denial is an appealable final decision. *Wong v. United States*, 373 F.3d 952, 960 (9th Cir. 2004). We may exercise jurisdiction over Winterrowd's other claims only if "the ruling is 'inextricably intertwined' with a claim properly before us on interlocutory appeal." *Id.* (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1284-85 (9th Cir. 2000)).

Winterrowd's other claims against the defendants—that they unconstitutionally seized his property, failed to comply with various federal and state regulations and issued citations that were incompatible with federal law—and his claim that his constitutional rights were violated during the course of the district court proceedings, are all unrelated to the question of whether the troopers used excessive force against him. We need not decide the merits of those claims in order to dispose of the qualified immunity claim, and we therefore lack jurisdiction to decide those issues in this appeal. *Id.*

Winterrowd also raises new claims and provides new evidence on appeal. We grant the defendants' motion to strike, to the extent that the material presented was not before the district court.

---

[3]Because this case arises on the troopers' motion for summary judgment on a qualified immunity claim, we present the facts in the light most favorable to Winterrowd. See *Adams v. Speers*, 473 F.3d 989, 990-91 (9th Cir. 2007). The officers claim Winterrowd turned towards Nelson during the pat-down, but Winterrowd claims he made no aggressive moves, and that if he turned, it was an involuntary response to Nelson's forcing his arm behind his back. A jury will have to resolve the conflicting versions as to what transpired after the stop.

Defendants also claim Winterrowd presented no evidence, instead making only general assertions in legal memoranda. See *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978). But Winterrowd—who represents himself—appended affidavits to briefs he submitted to the district court after his amended complaint. Those affidavits stated, "I . . . do swear (or affirm) that the foregoing facts in this document . . . are true and correct under the penalties of [sic] perjury." While this procedure is somewhat unorthodox, it substantially complies with Fed. R. Civ. P. 56(e), because it exposes Winterrowd to prosecution for perjury for any deliberately false factual statements in his briefs. While we might not countenance such a shortcut where a party is represented by counsel, we give pro se litigants greater latitude as to the format of their presentation. *Michenfelder v. Sumner*, 860 F.2d 328, 338 (9th Cir. 1988).

[4]"We have held that officers are justified in patting down an individual when they plan to have him sit in a patrol car." See *United States v. Thompson*, 597 F.2d 187, 190 (9th Cir. 1979). The circumstances in *Thompson*, however, differ from those here. In *Thompson*, "a standard police identification process" took place while the suspect was in the patrol vehicle. *Id.* Sitting in close proximity with a suspect presents officer safety concerns. And, as *Thompson* suggests, those concerns are heightened when an individual refuses to present identification. After all, the suspect could be concealing his identity for nefarious purposes.

3702 WINTERROWD v. NELSON

[1] Naturally, a police officer need not endanger himself by unduly crediting a suspect's mere claim of injury. We recognize that some suspects may feign injury in an attempt to hide weapons. But a statement that a suspect is physically unable to comply with a request does not, by itself, justify the use of force. Instead, the police may use force only when the intrusion on the individual's liberty is outweighed by the governmental interests at stake. *See Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005). We must thus determine whether the officers here could reasonably have concluded that the use of force was justified.

[2] Accepting Winterowd's version of the facts, the troopers could not have so concluded on the basis of the immediate offense. Winterowd wasn't even suspected of driving dangerously. Instead, the officers believed his license plates were invalid. No reasonable officer could conclude that an individual suspected of a license plate violation posed a threat that would justify slamming him against the hood of a car.

[3] Nor could the troopers have so concluded on the basis of any other fact presented here. Winterowd didn't take a swing at the officers, nor did the officers detect suspicious bulges or metallic glints on his person. According to Winterowd, he didn't resist the officers, nor did he flee.

The officers point to only three contemporaneous observations that they believe justified their use of force. First, the officers argue that, because they removed twenty to twenty-five pens and pencils from Winterowd's person, they could reasonably have concluded that he posed an immediate threat. But pens and pencils have legitimate, non-violent uses; many motorists carry them. The fact that ordinary objects in the possession of a suspect *could* be used as weapons cannot, standing alone, justify the use of force. There would have to be some indication that the individual in question intended to use these utensils to threaten or harm the officers. Any other rule would authorize the police to use force against virtually

WINTERROWD v. NELSON 3703

all motorists simply because they carry writing utensils, keys or other ordinary objects that could potentially be used as weapons.

[4] Defendants do not claim that Winterowd reached for a pen or pencil, or that he gave any other indication that he planned to wield those items belligerently. The fact that Winterowd had more than the usual number of such utensils is of no consequence. Having a large number of pencils may suggest some personal eccentricity, but it does not make it more likely that one of those utensils will be used as a weapon or otherwise enhance the risk to the officers. At most, it might suggest that the officers could reasonably exercise greater caution during the encounter.

[5] Second, the troopers imply that their use of force was justified because Winterowd carried a firearm in his car.[6] But they were unaware of this fact when they forced him onto the hood of their car. In any event, Winterowd was well away from his vehicle, and unable to access the weapon at the time.

[6] Third, the officers point to Winterowd's belligerent attitude and his belief that he was not required to register his vehicle. But on summary judgment we must accept Winterowd's claim that he was neither threatening nor physically abusive. Winterowd believed he was not required to register his vehicle with the State of Alaska. Such a belief—a mistake of law—is no different from that of a motorist who failed to see a stop sign, or who didn't realize the speed limit had dropped to 45 miles per hour. Even if Winterowd was adamant that registration was not required, that attitude would not justify the deliberate infliction of pain. Winterowd's objections were entirely verbal. At worst, the officers could conclude that he scoffed at state bureaucracy. Such an attitude

---

[6]Nothing in the record suggests that Winterowd's possession of the gun was illegal.

poses no physical danger and thus cannot justify the force allegedly used here.

The troopers also claim that they feared for their safety based on prior experiences with Winterrowd. The officers point to no facts that would have justified such a fear, voicing only vague suspicions: "I was aware that Mr. Winterrowd presented officer safety issues, including the exhibition of a hostile attitude toward Law Enforcement officers."

[7] Such generalized concerns, standing alone, cannot justify the use of force. *See Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."). The officers do not cite a single instance where Winterrowd was physically abusive when stopped by the police. At least one of the officers had, in fact, dealt with Winterrowd in the past, *see* n.4, *supra*, yet he presented no declaration that Winterrowd had been physically abusive during the prior encounters. At most, Winterrowd was shown to be verbally abusive; after being forced onto the hood of the car, he called the officers "jackbooted thugs," "armed mercenaries" and "[c]owards." Assuming that Winterrowd had used such epithets in the past, they would not justify the use of force. No officer likes being called a coward, but Winterrowd is well within his rights in making such statements. "[W]hile police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990).[7]

---

[7]"Indeed, this fact may cut the other way. Having recognized Winterrowd, the officers may have remembered that he didn't pay them the deference they believed was their due. Their behavior, then, may have been a response to his exercise of First Amendment rights, rather than to the

None of the violations that gave rise to Winterrowd's prior encounters with the police suggest a reasonable fear that he could be dangerous. He had been cited multiple times for having expired vehicle registrations, for failing to carry his driver's license, for failing to display plates and for failing to insure his vehicle. Such passive offenses cannot give rise to a reasonable inference that the suspect is dangerous, no matter how many of them he may have committed.

[8] The officers no doubt had an interest in confirming that Winterrowd was unarmed, but they had no justification for doing so in a physically abusive manner, as Winterrowd alleges. There were many ways the troopers could have checked for weapons short of pushing Winterrowd onto the hood of the police vehicle and yanking the arm he claimed was injured. Even if the officers doubted Winterrowd's claim that he had a shoulder injury, they were not entitled to use force to gain his compliance. When no immediate threat is posed and the police can use other means of patting down a suspect, they may not insist on doing so in a manner that will cause the suspect pain. We do not require officers to risk their own safety by crediting a suspect's claim that he is injured; we hold only that a verbal refusal to comply on grounds of physical impossibility does not justify the kind of manhandling that Winterrowd claims the officers inflicted on him.

[9] We now turn to whether a reasonable officer would have known that the use of force here was excessive. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001). Officers are entitled to qualified immunity unless they have been given fair notice that their conduct was unreasonable "in light of the specific

---

present situation. While we must consider the facts here "without regard to the arresting officer's subjective motivation for using force," *Tatum v. City & County of S.F.*, 441 F.3d 1090, 1095 (9th Cir. 2006), the officers' underlying motivations could cast doubt on their version of the incident. This is a matter to be sorted out by the trier of fact.

3706                     WINTERROWD v. NELSON

context of the case." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier*, 533 U.S. at 201). In *Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003), we found the suspect "did not pose a safety risk and made no attempt to leave." *Id.* at 1061. Likewise, the crimes being investigated were "nonviolent offenses." She may have "loudly asked . . . to see a search warrant" and "passively resisted" handcuffing, but did not use physical force. We found it clearly established that "grab[bing] [her] by the arms, throw[ing] her to the ground, and twist[ing] her arms while handcuffing her" was unreasonable. *Id.* Because we held in *Meredith* that the law on this point was clearly established as of July 10, 1998, it was also clearly established for the later incident here. No reasonable officer would believe he could constitutionally force a harmless motorist against the hood of a car and cause him unnecessary pain. *See id.* That the suspect claims he is unable to comply with instructions to put his arm behind his back provides no further justification. No reasonable officer could have thought otherwise.

\* \* \*

[10] An officer may not use force solely because a suspect tells him he is incapable of complying with a request during the course of an ordinary pat-down. The officers here admit that they could have patted Winterowd down without forcing his arm behind his back. They have shown no justification for pushing him onto the hood of the police car and yanking his arm. While the officers tell a different story, we must accept Winterrowd's version of the event. Because the facts, if resolved in Winterrowd's favor, would show the officers violated his clearly established constitutional rights, the district court did not err in denying the motion for summary judgment on grounds of qualified immunity.

**AFFIRMED.**